UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNESOTA DELI PROVISIONS, INC., | Civil No. 06-1275 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| BOAR'S HEAD PROVISIONS CO., INC., and FRANK BRUNCKHORST CO., LLC, | |
| Defendants. | |

David R. Crosby, **LEONARD STREET AND DEINARD, PA**, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, for plaintiff.

John Edward Connelly and Jesseca R.F. Cockson, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402-3901; Jacqueline G. Veit and Martin S. Hyman, **GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP**, 437 Madison Avenue, New York, NY 10022-7302, for defendants.

This case arises out of the termination of a business relationship between Boar's Head Provisions Co., Inc.,[1] a Delaware company that produces meats and cheeses, and Minnesota Deli Provisions, Inc., a Minnesota company that distributed those products primarily in Minnesota for approximately six years.  Following this termination, Minnesota Deli filed this action against Boar's Head alleging breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and tortious

---

[1] The second defendant in this case, Frank Brunkhorst Co., LLC ("Brunkhorst") works in close coordination with Boar's Head.  Boar's Head produces the meat and cheese products and Brunkhorst, a New York company headquartered in Sarasota, Florida, handles the distribution of those products.  Neither party suggests any distinction between these parties in terms of their liability or the availability of any defenses.  Consequently, the Court refers to the defendants collectively as Boar's Head throughout this order.

interference with prospective economic relations.  Boar's Head now moves for summary judgment.  For the reasons given below, the Court grants Boar's Head's motion, and dismisses Minnesota Deli's action in its entirety.

## BACKGROUND[2]

Boar's Head Provisions Co., Inc. ("Boar's Head") is a Delaware company headquartered in Sarasota, Florida.  Boar's Head produces meats and cheeses that are sold throughout the United States.  Boar's Head typically distributes its products by selling them to independent distributors.  The distributors then sell the products to retailers, such as supermarkets or delicatessens, who then sell directly to consumers.

In 1999, Boar's Head began exploring the possibility of distributing its products in Minnesota.  This expansion was likely to create an opportunity for an independent distributor to work with Minnesota retailers. John Marso learned of this opportunity, and decided to pursue it.  Marso met with Boar's Head representatives in Sarasota, and a short time later Boar's Head gave its preliminary approval to Marso serving as a Minnesota distributor.  Beginning in February 2000, Marso attended a six-week training program that Boar's Head required for its new distributors.  Following this training, Marso spent an additional seven weeks observing Boar's Head distributors in South Carolina and Texas.  Boar's Head ultimately approved Marso as a Minnesota distributor – through his new company Minnesota Deli Provisions, Inc. ("Minnesota Deli") – in August 2000.

---

[2] For the purposes of this summary judgment motion, the Court considers the facts and evidence in the light most favorable to Minnesota Deli, the non-moving party.

Marso discussed this approval with Boar's Head executive Rick Bellucci in an August 29, 2000, phone call, and Marso testified that it was in that conversation that he and Boar's Head reached an oral agreement concerning his distributorship. (Grassley Aff., Ex. F. at 175.) Marso alleges that during this call, Bellucci indicated that Marso would continue to be the distributor for the state of Minnesota so long as he grew his business. (Grassley Aff., Ex. F at 169-72.)

The parties did not commit their agreement to writing. However, on March 17, 2000, months before Boar's Head agreed to make Minnesota Deli a distributor, Marso signed a form acknowledging that he had read Boar's Head's Sales Policy for Out-of-Town Distributors ("Sales Policy"). That writing includes the following four passages:

> As a Boar's Head distributor, you are responsible for ensuring that all Boar's Head products are properly handled and rotated by your employees and your retailers. You must provide proper and continuous training regarding the handling, rotation and display of all products at both the distribution and retail levels. . . . It is the policy of the Company not to do business with any distributor that fails to satisfy our standards for cleanliness[,] freshness and presentation of product.
>
> * * *
>
> The Company reserves the right to make all judgments, in its sole discretion, as to where and by whom its products will be sold.
>
> * * *
>
> The Company does not grant "exclusive" territories to any distributor. No distributor may represent itself as an "exclusive" distributor of Boar's Head products, and it is the policy of the Company not to do business with any distributor that misrepresents its status . . . in this manner.
>
> * * *
>
> The Company reserves the right, in all circumstances, to ensure that all

-3-

>areas are being properly developed and to make whatever adjustments to its distribution system it deems necessary to achieve that objective, including the appointment of additional distributors in any geographic area or the implementation of direct sales.

(Hilleman Aff., Ex. E at ¶¶5, 9-10, 15.)  The Sales Policy does not give a specific duration for Boar's Head's relationships with its distributors, and does not expressly state that distributors will receive compensation if their accounts are reassigned or terminated.

Also during this time period, Boar's Head sent all of its existing distributors a letter raising concerns about "out-of-code" product – that is, product for sale beyond the date stamped on the package – appearing in retail stores.  (Pizzuro Aff., Ex. B.)  The letter indicated that Boar's Head was adopting a "zero tolerance" policy and that if any more out-of-code product was discovered, Boar's Head would terminate its relationship with the responsible distributor.

Minnesota Deli contends Marso was given a variety of verbal assurances that developed his understanding of the parties' agreement.  Marso alleges that the term established in his call with Bellucci – making him the Minnesota distributor so long as he performed adequately – was "reinforced" by later comments from Boar's Head employees, describing Minnesota as "his market" and expressing optimism about his future working with Boar's Head.  (*Id*. at 173-75, 185-95, 200-01.)  Marso also testified, however, (1) that he did not have any conversations with Boar's Head employees about how long he could be an authorized distributor of Boar's Head products; (2) that he did not have any conversations with Boar's Head employees about any limitations on Minnesota Deli's ability to terminate the agreement; and (3) that he did not have any

conversations with Boar's Head about a distributor's right to sell "accounts" with retailers until August 2005.  (*Id*. at 205, 209, 218.)

Minnesota Deli was successful, with sales reaching $1.3 million in 2001 and $5.3 million in 2004.  Marso alleges that during the course of this successful period, numerous Boar's Head employees continued to describe Minnesota as "his market," and that Boar's Head's regional sales manager Brent Lindorfer told him that Boar's "would never do anything to [him]."  (Bartusch Aff., Ex. G at 193.)  Marso alleges that Lindorfer further indicated that Boar's Head had no plans to appoint additional distributors in his territory.  Finally, Marso alleges that early in Minnesota Deli's existence Boar's Head executive Sherry Robert told him that he would have the right to sell any accounts that he developed,  (Bartusch Aff., Ex. G at 213-14.), and that this was consistent with Boar's Head's dealings with other distributors.  In the time period when these comments occurred, Minnesota Deli made additional investments by purchasing a warehouse and several additional delivery trucks.

In August 2005, Scott Williams, another of Boar's Head's employees, visited several Minnesota supermarkets purchasing its products from Minnesota Deli.  Williams sent a report back to Joe Pizzuro, defendant's national sales manager, indicating that he had discovered some out-of-code product in several stores.  Minnesota Deli alleges that this is a common problem that had been discovered with dozens of Boar's Head's distributors, and that Boar's Head's practice was to ignore the problem, require additional training, or allow the distributor to sell its accounts.  Minnesota Deli further alleges that Marso was never told of any policy whereby a distributor's "accounts" with particular

retailers would be reassigned if Boar's Head learned that its grocers were selling out-of-date product.

On August 19, 2005, Marso was summoned to New York to meet with Pizzuro and Lindorfer. Marso was informed of Boar's Head's discovery, and told that Boar's Head would be reassigning five of his accounts to another distributor without compensation. Marso was offered a chance to attend a six-week "product integrity" training, to improve his performance and retain his remaining accounts. Marso declined. Nonetheless, Marso alleges he was told that Boar's Head would help him resolve the product issue, and that he would be permitted to proceed with his remaining accounts with a "clean slate."

Two weeks after this meeting, Boar's Head sent additional employees to Minnesota Deli's retailers to look for further out-of-code product. Lindorfer reported to Pizzuro that the employees discovered out-of-code product in five additional stores. Shortly thereafter, Marso was informed that Boar's Head would be stripping Minnesota Deli of these five additional accounts. Marso alleges that the true reason for this step was that five accounts – the number that had been stripped from him earlier – was not enough to support another Minnesota distributor, so Boar's Head needed to take five more. Marso responded to this news by saying that he now wanted to sell his entire distributorship. He alleges that he was given 90 days to sell his remaining accounts, but was told that he did not have permission to sell the ten disputed accounts.

Marso alleges that Boar's Head later placed an ad in the Star Tribune newspaper seeking distributors, and was uncooperative when he found a qualified buyer on his own.

Boar's Head ultimately reassigned Minnesota Deli's ten stripped accounts in the spring of 2006, without compensating Marso.

On March 10, 2006, Minnesota Deli filed this action against Boar's Head challenging the reassignment of the ten disputed accounts. Minnesota Deli contends that it was a given the exclusive right[3] to distribute Boar's Head products within its territory, and that this agreement was one of infinite duration so long as it performed adequately. Minnesota Deli argues that Boar's Head failed to honor these terms by reassigning its accounts without compensation even though Minnesota Deli was performing adequately. Based on this conduct, Minnesota Deli brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. Minnesota Deli also brings a claim for tortious interference with prospective economic relations, based on Boar's Head's alleged interference with Minnesota Deli's relations with Minnesota retailers.

Shortly after this lawsuit was filed, Boar's Head sent employees to look for further out-of-code product in Minnesota Deli's market. After again finding out-of-code product, Pizzuro ordered that Minnesota Deli's entire distributorship be terminated, and in April 2006, Minnesota Deli was given a termination notice effective in 90 days. All of Minnesota Deli's accounts were ultimately reassigned to another distributor without compensation to Marso. On September 14, 2006, Minnesota Deli filed an amended complaint adding these allegations and claiming additional damages.

---

[3] Minnesota Deli has since clarified that it is not claiming the exclusive right to distribute Boar's Head's products in Minnesota. Rather, Minnesota Deli contends that it had the exclusive right to sell Boar's Head's products to the retailers it had already developed relationships with. (Plaintiff's Memo at 36 n.11.)

**ANALYSIS**

I.   **STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

II.   **BREACH OF CONTRACT**

In Minnesota, "[t]he general rule is that a contract having no definite duration, expressed or which may be implied, is terminable at will upon reasonable notice to the other."  *Benson Co-op Creamery Ass'n v. First Dist. Ass'n*, 151 N.W.2d 422, 426 (Minn. 1967); *see also* Minn. Stat. § 336.2-309(2)-(3) (incorporating the same standard into Minnesota law for cases governed by the U.C.C.).  Boar's Head argues that this rule applies here because the parties did not agree on a duration for Minnesota Deli's distributorship.

Minnesota Deli disagrees, arguing that the parties agreed that Boar's Head would only terminate the agreement if Minnesota Deli failed to perform adequately.  Minnesota

Deli argues that the parties also agreed that it would not be stripped of any of its accounts without compensation. As evidence that these conditions were part of the agreement, Minnesota Deli relies on oral assurances by Boar's Head employees and Boar's Head documents. After a careful review of these documents and the remainder of the record, however, the Court does not find this evidence sufficient to support Minnesota Deli's view of the agreement.

As noted above, Marso testified that the performance condition was agreed to in an August 2000 telephone conversation with Bellucci, and "reinforced" by later conversations with other Boar's Head employees. (*See* Grassley Aff., Ex. F at 175.) However, when asked to indicate what Bellucci said in the 2000 conversation, Marso merely recalled statements that he would "be the distributor in the state of Minnesota," and that Minnesota was "[his] to grow." (*Id*. at 171-72.) These vague statements of encouragement do not touch directly on the topic of termination, and were insufficient as a matter of law to create an enforceable limit on Boar's Head's right to terminate. As to the later conversations, Minnesota Deli points to similar statements of encouragement, including the frequent description of Minnesota as "[Marso's] market." The Court has carefully reviewed each of these statements in the record, and finds nothing that rises beyond the vague encouragement expressed by Bellucci, and nothing sufficient to create a binding obligation. *Cf. Benson*, 151 N.W.2d at 426-27 (finding a genuine issue of material fact where several agents of the allegedly breaching party testified that they *also* believed the relevant contract included a just cause provision).

While Minnesota Deli argues that the performance condition is further supported by Boar's Head documents, each of those documents generally confirms Boar's Head's position that the agreement was terminable at will. Minnesota Deli first points to an email from Lindorfer to Pizzurro, making suggestions for how Boar's Head should explain its position to Marso. Minnesota Deli emphasizes the following passage: "as you are well aware, [Boar's Head] does not regularly stop selling products to its customers except in circumstances that put the integrity of the brand at risk." (Hilleman Aff., Ex. O.) Immediately before this passage, however, the email states: "Let me remind you one last time that there are no Boar's Head franchises and our business relationship is an at will relationship, meaning that you may choose to stop purchasing BH products at anytime for any reason and that [Boar's Head] may stop selling BH product to you at any time for any reason." (Hilleman Aff., Ex. O.) Minnesota Deli also relies on statements from a Boar's Head document discussing the transfer of sales routes and Boar's Head's Sales Policy. However, both documents expressly include express statements affirming Boar's Head's "sole discretion" to make decisions about who sells its products. *Cf. Best Vendors Co. v. Air Express, Inc.*, No. 00-2224, 2002 WL 31163039, at *3 (D. Minn. Sept. 23, 2002) (finding a genuine issue of material fact where the allegedly breaching party had sent a letter indicating that their agreement would continue for 36 months, and "would *only* be adjusted should the current level of performance change to what would be deemed substandard by our client"). In sum, these documents fail to support Minnesota Deli's view of the contract.

As to the right to sell its accounts, Minnesota Deli does not allege that this right was discussed in Marso's August 29, 2000, phone call with Bellucci establishing their agreement.  Rather, Minnesota Deli alleges that Marso was later told of this right by Robert.  In his deposition, however, Marso was unable to recall exactly where or when this comment was made, and did not indicate that he and Robert specifically discussed the sale of accounts in the context of a termination.[4]  Moreover, Marso later indicated that he had "absolutely not" had any discussions with Boar's Head about account sales in the context of termination before August 2005, approximately five years after the parties reached their agreement.  (*See* Bartusch Aff., Ex. G at 213, Grassley Aff., Ex. F at 218-19.)  Finally, when squarely asked whether there was "an agreement between Minnesota Deli and . . . Boar's Head that Minnesota Deli would not be terminated unless being allowed to sell," Marso responded "[n]o."  (Grassley Aff., Ex. F at 217.)[5]  In those circumstances, Robert's comment was insufficient to support an enforceable addition to the parties' contract.

---

[4] Marso initially indicated that Robert told him he could sell his accounts in "all" circumstances.  (Bartusch Aff., Ex. G at 214.)  However, when pressed as to whether "she said under all circumstances, or she didn't put any limitation on it," Marso responded "*I don't know* that there's a limitation."  (*Id*.) (emphasis added).  In other words, Marso did not indicate that he received specific assurance that he would be free to sell his accounts in the context of a termination.

[5] Minnesota Deli sought to correct this admission with an errata sheet, indicating that Marso meant there was no "written agreement," and that his understanding of that agreement was based on "our course of dealing with Boar's Head's treatment of other distributors." (Grassley Aff., Ex. F.)  Conspicuously absent from this explanation is any specific mention of communications between Minnesota Deli and Boar's Head.  In any event, as explained in the text of this order, the Court finds the support cited in this errata sheet insufficient to demonstrate the agreement alleged by Minnesota Deli.

Minnesota Deli also relies on Boar's Head's dealings with other parties, its distribution of documents intended to help with account transfers, and a Boar's Head newspaper ad stating that "The Best Route to Success is the One You Own." However, as Boar's Head points out, none of this circumstantial evidence goes to the specific agreement reached between Boar's Head and Minnesota Deli, particularly where Marso admitted that this topic was not discussed until five years after the creation of the agreement. Boar's Head was free to negotiate different arrangements with different distributors, and the generic reference to ownership in the ad could plausibly refer to Marso's undisputed ownership of Minnesota Deli, rather than ownership over a right to sell Boar's Head products. Accordingly, the Court finds insufficient evidence for a reasonable juror to conclude that Boar's Head agreed to allow Minnesota Deli to sell its accounts upon the termination of its distributorship.[6]

In summary, establishing a contract requires evidence of a meeting of the minds. While Marso may well have believed that his distributorship would continue indefinitely, or that he would be paid for the relationships that he established with Minnesota grocers, "[t]he existence of a contract . . . depends upon the parties' observable conduct, not on

---

[6] The Court adds that neither party has explained how the right to "sell" accounts is consistent with the at-will status of Boar's Head distributorships. In short, it is unclear what, precisely, a party seeking to sell its distributorship has to "sell," particularly in a situation where Boar's Head had declared its intention to sever ties. The purchasing distributor would seem to be buying into a situation where it could also be terminated at will, possibly even a short time after it "purchased" the prior distributor's accounts. Moreover, if an aspiring distributor wanted to be in that position, it is unclear why it could not simply approach Boar's Head directly. If Boar's Head really wanted the new party to serve as a distributor, it could then – at least as a matter of law – terminate any existing distributors and begin a relationship with the new distributor. In sum, an aspiring distributor who "buys" accounts would seem to be buying an uncertain future that it could acquire directly from Boar's Head without paying any money. In any event, the Court finds insufficient evidence that this right to sell upon termination was agreed upon by the parties.

their subjective expectations." *Corum v. Farm Credit Servs.*, 628 F. Supp. 707, 714 (D. Minn. 1986). Marso's understanding was not memorialized in any writing, and there is insufficient evidence for a reasonable juror to conclude that it was the subject of an oral agreement. Thus, the Court concludes that the parties entered into an at-will business relationship, terminable upon reasonable notice. As Minnesota Deli's argument that it did not receive adequate notice focuses exclusively on its unsuccessful claim that it should have been given an opportunity to sell its accounts, the Court finds insufficient evidence that Boar's Head breached the parties' agreement.[7] Accordingly, Minnesota Deli's breach of contract claim is dismissed.

### III. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995). Minnesota Deli argues that Boar's Head breached this implied covenant by handling its discretion under the contract unfairly. However, "[u]nder Minnesota law, a cause of action for breach of the implied duty of good faith and fair dealing does not exist independently of a breach of contract claim." *Semanko v. Minn. Mut. Life Ins. Co.*, 168 F. Supp. 2d 997, 1002 (D. Minn. 2000). Because the Court

---

[7] "Reasonable notice is that period of time necessary to close out accounts and minimize losses." *Viking Supply v. Nat'l Cart Co., Inc.*, 310 F.3d 1092, 1098 (8th Cir. 2002). The Court notes that following Boar's Head's 90-day notice, Minnesota Deli was able to sell its warehouse for approximately $100,000 more than it paid two years prior. (Grassley Aff., Ex. F at 14, Ex. G.)

has concluded that Minnesota Deli's breach of contract claim must be dismissed for the reasons discussed above, the Court must dismiss this claim as well. *See id*.

## IV. PROMISSORY ESTOPPEL

Minnesota Deli argues that even if the Court does not find an enforceable contract for the reasons articulated above, it justifiably relied on Boar's Head's promises in investing in its distributorship. Under Minnesota law, promissory estoppel requires (1) a clear and definite promise; (2) intent to induce reliance; (3) actual reliance; (4) a need to enforce the promise in order to prevent injustice. *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 372 (Minn. 1995). The Court finds that the shortcomings in Minnesota Deli's evidence addressed above also prevent it from demonstrating a "clear and definite" promise. Accordingly, Minnesota Deli's promissory estoppel claim is dismissed as well.

## V. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

To establish a claim for tortious interference with business relations under Minnesota law, Minnesota Deli must prove that Boar's Head "intentionally committed a wrongful act that improperly interfered with [plaintiff's] prospective business." *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 832 (8th Cir. 1996). "[I]mproper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Id*. The policy underlying this tort is "to protect the expectations of contracting parties against the frustration by outsiders who have no legitimate social or economic interest in the contractual relationship." *Harman v.*

*Heartland Food Co.*, 614 N.W.2d 236, 241 (Minn. Ct. App. 2000) (quotation omitted). Minnesota Deli contends that Boar's Head tortiously interfered with its relations with the end-sellers of Boar's Head's products. However, as noted above, Boar's Head's sales policy expressly reserves its "right to make all judgments, in its sole discretion, as to where and by whom its products will be sold." (Hilleman Aff., Ex. E at ¶9.) Put another way, the relationships that Boar's Head allegedly interfered with were built in large part on sales of Boar's Head's products. In those circumstances, Boar's Head's exercise of rights expressly reserved in its Sales Policy in managing the sales of its own products did not constitute interference as a matter of law. *Cf. Frank Brunkhorst Co., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 464 (E.D. Va. 2008) (finding a tortious interference claim insufficient under Virginia law in nearly identical circumstances). Accordingly, Minnesota Deli's tortious interference claim must be dismissed as well.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' Motion for Summary Judgment [Docket No. 67] is **GRANTED**. Plaintiff's Complaint is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 30, 2008            _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                United States District Judge